Slip Op. 13-156

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **UNITED STATES STEEL CORPORATION,**<br><br>Plaintiff,<br><br>and<br><br>**NUCOR CORPORATION,**<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>**UNITED STATES,**<br><br>Defendant,<br><br>and<br><br>**HYUNDAI HYSCO, POHANG IRON & STEEL CO., LTD., and POHANG COATED STEEL CO., LTD.,**<br><br>Defendant-Intervenors. | **Before: Claire R. Kelly, Judge**<br>**Consol. Court No. 12-00071**<br>**Public Version** |

## OPINION

[Sustaining Commerce's antidumping duty administrative review]

Dated: 12/27/2013

Ellen J. Schneider, Skadden Arps Slate Meagher & Flom, LLP of Washington, DC argued for Plaintiff.  With her on the brief were Robert E. Lighthizer and Jeffrey D. Gerrish.

Timothy C. Brightbill, Wiley Rein, LLP of Washington, DC argued for Plaintiff-Intervenor.  With him on the brief was Alan H. Price.

Tara K. Hogan, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant.  With her on the

brief were <u>Stuart F. Delery</u>, Principal Deputy Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Reginald T. Blades, Jr.</u>, Assistant Director.  Of counsel on the brief was <u>Nathaniel J. Halvorson</u>, Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC.

     <u>Jarrod M. Goldfeder</u>, Akin, Gump, Strauss, Hauer & Feld, LLP, of Washington, DC, argued for Defendant-Intervenors.  With him on the briefs were <u>J. David Park</u>, and <u>Sally S. Laing</u>.

     Kelly, Judge: This matter is before the court on motions for judgment on the agency record by Plaintiff, United States Steel Corporation ("U.S. Steel"), and by Plaintiff-Intervenor, Nucor Corporation ("Nucor"), (collectively "Plaintiffs"), both members of the domestic industry, pursuant to USCIT Rule 56.2.  Plaintiffs' action, brought pursuant to section 516A of the Tariff Act of 1930 ("Tariff Act" or the "Act"), as amended, 19 U.S.C. § 1516a (2006),[1] challenges the United States Department of Commerce's ("Commerce") final determination in the administrative review issued in <u>Certain Corrosion-Resistant Carbon Steel Flat Products From the Republic of Korea</u>, 77 Fed. Reg. 14,501 (Dep't Commerce Mar. 12, 2012) ("<u>Final Results</u>") which found *de minimis* margins for two respondents, Defendant-Intervenors herein.  Defendant, United States, and Defendant-Intervenors, Pohang Iron & Steel Co., Ltd. and Pohang Coated Steel Co., Ltd. (collectively "POSCO"), and Hyundai HYSCO ("HYSCO") oppose this action.  The administrative review arises from the antidumping duty order covering certain corrosion-resistant carbon steel flat products ("CORE") from Korea.  <u>See, e.g.</u>, Pl.'s Compl. at ¶ 1, Mar. 23, 2012, ECF No. 6; <u>see also</u> <u>Certain Cold-Rolled Carbon Steel Flat Products and Certain</u>

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition, and all applicable supplements.

Corrosion-Resistant Carbon Steel Flat Products From Korea, 58 Fed. Reg. 44,159 (Dep't Commerce Aug. 19, 1993) (antidumping duty order).   Commerce initiated the 17th administrative review on September 29, 2010, for, among others, POSCO and HYSCO. See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part, 75 Fed. Reg. 60,076, 60,077 (Dep't Commerce Sept. 29, 2010).

## BACKGROUND

Both POSCO and HYSCO produce and sell several different product types of CORE subject to the dumping order in question.   Commerce based its review of the subject merchandise on twelve different model-match criteria, one of which is temper rolling.[2]   HYSCO produces and sells temper rolled ("TR") and non-tempered rolled ("NTR") merchandise in both the United States and its home market.   In its review, Commerce chose the date of shipment as the date of sale for POSCO's U.S. sales in order to determine the dumping margin.   Further, it considered HYSCO's NTR home market sales to be made within the ordinary course of trade.   Finally, after it found a de minimis margin for POSCO for the third consecutive review, Commerce revoked the order with respect to POSCO.   Final Results at 14,501; Issues and Decision Memorandum for the Final Results of the 17th Administrative Review of the Antidumping Duty Order on Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea (2009-2010) cmts 3, 5, 6, A-580-816, (Mar. 5, 2012) ("Issues and Decision

---

[2] Temper rolling "refers to a finishing operation that smoothes [sic] the surface of the steel."   Mem. Def.-Interv. HYSCO Opp'n to Pl.'s Rule 56.2 Mot. J. at 4, Feb. 25, 2013, ECF No. 68.

Memorandum"), <u>available     at</u>     http://enforcement.trade.gov/frn/summary/Korea-south/2012-5937-1.pdf (last visited Dec. 4, 2013).

Plaintiffs challenge Commerce's selection of the shipment date as the date of sale for POSCO, <u>see, e.g.</u>, Pl.'s Compl. at ¶ 10-11, and Commerce's determination that certain sales of NTR merchandise by HYSCO were within the ordinary course of trade. <u>Id.</u> at ¶ 16-17.  Further, Plaintiffs challenge Commerce's revocation of the dumping order with respect to POSCO.  <u>Id.</u> at ¶ 12-13.

For the reasons set forth below, the court sustains Commerce's selection of the shipment date as the date of sale for POSCO's U.S. sales, its findings that HYSCO's sales of NTR merchandise were within the ordinary course of trade, and its decision to revoke the antidumping duty order with respect to POSCO.

## JURISDICTION

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006),[3] and 19 U.S.C. § 1516a(a).

## DISCUSSION

### Standard of Review

"The court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(i).  To be in accordance with law, a decision must not be arbitrary and capricious, contrary to regulations, statutes or the

---

[3] Further citations to Title 28 of the U.S. Code are made to the 2006 edition, and all applicable supplements.

Constitution, and must be supported by substantial evidence and reasoned explanations. See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 41-43, 103 S.Ct. 2856, 2866-67 (1983); SKF USA Inc. v. United States, 630 F.3d 1365, 1373-74 (Fed. Cir. 2011).  Substantial evidence exists on the record when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Nippon Steel Corp. v. United States, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126, 140 (1938)).  However, the "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456, 467 (1951).  Nevertheless, "the possibility of drawing two inconsistent conclusions from the evidence does not invalidate Commerce's conclusion as long as it remains supported by substantial evidence on the record." Zhaoqing New Zhongya Aluminum Co. v. United States, 36 CIT __, __, 887 F. Supp. 2d 1301, 1305 (2012) (citing Universal Camera Corp., 340 U.S. at 488, 71 S.Ct. at 465, 95 L.Ed. at 467-68).

**Date of Sale**

Commerce's determination that POSCO's date of sale should be based on the date of shipment is supported by substantial evidence and in accordance with law. Commerce calculated dumping margins in this case on a constructed export price ("CEP") basis, so the date of sale for purposes of determining the U.S. price of the subject merchandise was the date the merchandise was first sold to a party not affiliated with

POSCO.  See 19 U.S.C. § 1677a(b).  The regulation instructs Commerce how to identify

the date of sale generally.  It provides:

> Date of sale. In identifying the date of sale of the subject merchandise or
> foreign like product, the Secretary normally will use the date of invoice, as
> recorded in the exporter or producer's records kept in the ordinary course
> of business.  However, the Secretary may use a date other than the date of
> invoice if the Secretary is satisfied that a different date better reflects the
> date on which the exporter or producer establishes the material terms of
> sale.

19 C.F.R. § 351.401(i)(2013).  Thus, the regulation sets forth a presumption that "the

Secretary normally will use the date of invoice" for the date of sale but "may use a date

other than the date of invoice if the Secretary is satisfied that a different date better reflects

the date on which the exporter or producer establishes the material terms." 19 C.F.R.

§ 351.401(i)(2013).  See Sahaviriya Steel Indus. Pub. Co. v. United States, 34 CIT __,

__, 714 F. Supp. 2d 1263, 1279 (2010) ("Thus, Commerce's date of sale regulation

provides for a 'rebuttable presumption' that invoice date will normally be identified as the

date of sale." (citation omitted)), aff'd, 649 F.3d 1371 (Fed. Cir. 2011).  Although

Commerce's regulation provides that the date of sale will normally be the invoice date,

Congress has "expressed its intent that, for antidumping purposes, the date of sale be

flexible so as to accurately reflect the true date on which the material elements of sale

were established." Allied Tube and Conduit Corp. v. United States, 24 CIT 1357, 1370,

127 F. Supp. 2d 207, 219 (2000).

Implicated in this case is what discretion the Secretary has to be "satisfied"

that a date other than the invoice date is more appropriate as the date of sale.  In other

words, the question is whether record evidence supports a conclusion by the Secretary

that the shipment date better reflects the date on which the exporter or producer established the material terms of sale.  Material terms include price and quantity among others.  See Sahaviriya Steel, 34 CIT at __, 714 F. Supp. 2d at 1280.

Commerce found that "the material terms of sale were set at the time of shipment."  Issues and Decisions Memorandum at cmt 6.  Commerce relied on POSCO's questionnaire response regarding the date of sale, record documentation regarding when the material terms of sale were set, a long-standing business practice in the Korean steel industry, and the U.S. sales process for all four respondents.  Issues and Decision Memorandum at cmt 6 nn.95-99.  Further, it noted "HYSCO has reported ship date as date of sale consistently in previous reviews which the Department has accepted."  Id. at nn.99.

POSCO's questionnaire responses and supporting documentation in the record establish POSCO's sales process.  POSCO's U.S. affiliate, POSCO America Corporation ("POSAM"), negotiates and executes purchase orders with United States customers.[4]  Def.'s Opp'n. Pl.'s Mot.'s J. at 19, Feb. 27, 2013, ECF No. 72; see also Mem. POSCO POHANG Coated Steel Co., Ltd., Opp'n Pl.'s and Pl.-Interv.'s 56.2 Mots.' J. at 25-27, Feb. 25, 2013, ECF No. 70; POSCO's Dec. 20, 2010 Sect. A Resp. at A-18, A-24, PD I 52, CD I 8 (Dec. 20, 2010), ECF No. 32 (May 7, 2012).  Then, on a monthly basis the U.S. customer sends an email to POSAM outlining the quantities and types of products it would like to order.  Def.'s Opp'n. Pl.'s Mot.'s J. at 19.  Next, POSAM enters

---

[4] Although POSAM is the importer of record for the goods shipped by POSCO, POSAM does not take possession of the goods.

the order into POSCO's computer system, "which is the basis for generating an order sheet."  Id.  POSCO then manufactures the products and, after shipping arrangements are made, ships the products directly to the U.S. customer.  Id.

Based upon the foregoing description of the sales process as supported by POSCO's questionnaire responses, a reasonable mind could conclude the parties intend the quantity and delivery terms to be fixed when POSCO ships the merchandise to the U.S. customer.  In Commerce's Section A questionnaire dated October 29, 2010, Commerce requested POSCO to report its date of sale for home market sales and U.S. sales.  See POSCO's Dec. 20, 2010 Sect. A Resp. at A-22.[5]  POSCO responded on December 20, 2010 and stated that "[f]or U.S. sales, POSCO has reported the date of shipment from the mill in Korea as the date of sale.  The invoice issued to the customer by POSAM is issued long after the date of shipment."  Id. at A-23.  POSCO's response supports its intention as to the date of sale.  However, Commerce did not accept this

---

[5] In particular Commerce's question asks:
> Sales Process:  The date of sale for your sales to the United States and the foreign market is important to the Department's analysis. It will determine which sales are reported in response to sections B and C of this questionnaire and the exchange rate used to convert normal value into US dollars. Note, however, that the Department's criteria for determining date of sale may differ from those that you apply in the normal course of business. A description of the Department's criteria is included in the Glossary of Terms at Appendix I; please use these criteria in preparing your response to this questionnaire. If you have difficulty deciding which date to use as the date of sale, please contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire (the issuance date of this questionnaire appears on the first page of the cover letter). Describe the sales process for each method or channel of distribution described in response to question 3 above.  Include a description of each step in the sales process.

POSCO's Dec. 20, 2010 Sect. A Resp. at A-22.

assertion at face value but followed up with a supplemental questionnaire on April 6, 2011.

In that questionnaire it asked POSCO for more information regarding its date of sale.

Commerce stated,

> Please provide a copy of all sales documents which set the material terms of sale, including quantity and price, agreed upon between POSCO America Corporation (POSAM) and your unaffiliated U.S. customer for the top five largest U.S. sales by quantity: SEQUs [[                                        ]].
> Furthermore, please state if there were any changes to the material terms of sale following shipment for any of your U.S. sales during the period of review.

POSCO's May 4, 2011 Supp. Sect. A-C QNR at 1, PD I 124, CD I 39 (May 4, 2011), ECF

No. 32 (May 7, 2012).  POSCO responded that "POSAM and its unaffiliated customers

generally set price and quantity terms through e-mail correspondence."  Id.  POSCO

further cites documents attached at Exhibit S-1.  Each sequence at Exhibit S-1 contains

several documents including a purchase order, an order sheet, an invoice issued between

POSCO and POSAM, a packing list, a bill of lading, an entry summary, and finally a

commercial invoice between POSAM and the U.S. customer.  See id. at Ex. 1.

POSCO also discusses possible changes to material terms including

quantity and delivery destination that can occur after the purchase order but before

shipment.  Id. at 1.  Finally, POSCO states that shipment date is the best date of sale:

> because it reflects the date on which the material terms of sale become firmly established.  Indeed, the two changes noted above occur on or before the date of shipment, which is subsequent to the date of the initial order. Using shipment date as the date of sale is also consistent with the Department's longstanding practice, including in this proceeding, that the date of sale cannot be later than the date of shipment of the subject merchandise to the unaffiliated U.S. customer.

Id. at 1-2.

In this supplemental questionnaire, Commerce also noted [[

]] and asked for "calculation worksheets and source documentation

[[                                                                  ]]." Id. POSCO responded to this query by

stating "[t]he difference between POSCO's price to POSAM and POSAM's price to the

unaffiliated customer is attributable to [[

]]." Id.

POSCO provided a worksheet showing calculations at Exhibit S-3. The worksheet

provided by POSCO shows the values it placed on each of these expenses. After adding

them all together the total equals the price invoiced from POSAM to the U.S. customer.

Commerce probed further and on July 20, 2011 Commerce issued another

supplemental questionnaire. See Dept.'s July 20, 2011 Supp. Sect. A-C QN, PD I 167,

CD I 58 (Jul. 20, 2011), ECF No. 32 (May 7, 2012). It asked for more date of sale

information. Id. at 2.

1. You state that "there were no changes to the material terms of sale
   following shipment for any of {your} U.S. sales during the POR" on page
   1 of your May 2, 2011, supplemental questionnaire response (May QNR
   Response). Please provide the documents that finalizes [sic] the
   material terms of sale (i.e., price, quantity, delivery terms, and payment
   terms) at the date of shipment and that shows that such terms did not
   change after the shipment date for (i.e., SEQUs [[
        ]] your U.S. sales during the POR.
2. You stated in your May QNR Response that "POSAM and its unaffiliated
   customers generally set price and quantity terms through email
   correspondence." However, [[

                                                        ]]. All of the

   other sales documents which you submitted [[

]]. Please provide sales documents which set the material terms of sale between POSAM and the unaffiliated U.S. customer for your top five largest U.S. sales by quantity (i.e., SEQUs [[                              ]]).

3. You stated that [[

]] For SEQUs [[                ]], provide invoices or other source documentation clearly showing the actual amounts paid for the following expenses: [[

]] In addition, you only provided a calculation worksheet for SEQU [[    ]]. Please provide calculation worksheets for the other four sales, specifically SEQUs [[                ]].

Id. POSCO responded to the July 20, 2011 questionnaire on August 3, 2011 providing Commerce with documents and worksheets regarding international freight, U.S. brokerage and handling, marine insurance, and U.S. duty. POSCO's Aug. 3, 2011 Supp. Sect. A-C QNR, PD I 171, CD I 62 (Aug. 3, 2011), ECF No. 32 (May 7, 2012).

The record taken as a whole contains substantial evidence for a finding by Commerce that the shipment date reflected the date on which the parties established the material terms. POSCO asserted that the shipment date was the date of sale in its questionnaire. As discussed above, Commerce did not merely accept this assertion at face value but probed further and elicited information and documentation concerning the circumstances surrounding POSCO's sales. Commerce reasonably made its date of sale determination based upon the responses it received, Commerce's knowledge of the industry, and the lack of any evidence, that would undermine or contradict its findings.

The Plaintiffs claim that the lack of any one single document memorializing the material terms being fixed at the time of shipment precludes shipment date as a viable date of sale. See Mem. Supp. Pl. U.S. Steel Mot. J. at 15, Sept. 24, 2012, ECF No. 46;

Br. Supp. Nucor 56.2 Mot. at 18-19, Sept. 24, 2012, ECF No. 45; Oral Arg. at 1:08:28-54,

Oct. 28, 2013, ECF No. 100.  Nothing in the regulation requires Commerce to base its

decision upon such a single document.  This argument ignores the language of the

regulation.  Commerce may choose a date other than the date of invoice as the date of

sale if it satisfies itself that another date better represents when the parties established

the material terms.  Here, it relied upon the questionnaire response, its knowledge of the

industry, and its understanding of how the transactions took place as supported by record

evidence.

          Moreover, despite protestations to the contrary, no documents or evidence

relied upon by the Plaintiffs undercuts Commerce's findings.  Plaintiffs point to the offer

sheet, the purchase order, and the commercial invoice, note that the prices on each are

different, and argue that therefore the commercial invoice is the only possible evidence

establishing when the material terms are set.  However, no one argues that the offer sheet

or the purchase order represented or showed the final price.  Commerce determined

according to record evidence that the terms were fixed upon shipment.  The existence of

these other documents, or the fact that they show different amounts, does not detract

from that finding.  While it is conceivable that Commerce might have drawn another

conclusion from these documents, "the possibility of drawing two inconsistent conclusions

from the evidence does not invalidate Commerce's conclusion as long as it remains

supported by substantial evidence on the record." Zhaoqing New Zhongya Aluminum, 36

CIT at __, 887 F. Supp. 2d at 1305 (citing Universal Camera Corp., 340 U.S. at 488, 71

S.Ct. at 465, 95 L.Ed. at 467-68).

Plaintiffs argue strongly that Commerce's practice of using the shipment date as the date of sale when shipment date precedes invoice date is not in accordance with law because it "contradicts Commerce's own regulations."  Mem. Supp. Pl. U.S. Steel Mot. J. at 20.  This argument holds some weight.  The regulation states that the Secretary "normally will use the date of invoice" for the date of sale.  19 C.F.R. § 351.401(i)(2013).  A determination that relied solely on a practice to use shipment date when it precedes invoice date would appear to contradict this language.  See Mittal Steel Point Lisas Ltd. v. United States, 31 CIT 638, 647, 491 F. Supp. 2d 1222, 1231 (2007) (stating that Commerce's practice "is in contradiction to Commerce's statement in the [regulation's] preamble" but noting other courts have "implicitly approved" the practice), aff'd, 548 F.3d 1375 (Fed. Cir. 2008).

While the second sentence of the regulation allows Commerce to choose a date other than the invoice date, it requires that Commerce be "satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale."  19 C.F.R. § 351.401(i)(2013).  The second sentence therefore clarifies that while normally the invoice date will be the date of sale, another date can be chosen if Commerce makes a determination in a particular case so as to "satisfy" itself.  This second sentence requires Commerce to make a fact-specific determination in a particular case that another date better reflects the date on which the material terms were established.[6]  It would seem that, by definition, a general practice cannot satisfy such a

---

[6] One could argue that the second sentence does not exhaust the range of circumstances in which Commerce could deviate from its "normal" practice.  However, to the extent that there could be any ambiguity in the regulation, Commerce foreclosed the possibility that

fact-specific command.   While Commerce's knowledge of the industry, including how business is done, is not irrelevant, any purported practice alone would seem not to be enough to satisfy the standard that the regulation, written by Commerce, provides.[7]

However, here Commerce did not rely solely upon the practice.  Commerce made a specific finding that the shipment date better reflected the date on which the material terms were set by the parties.  It did so based upon evidence in the record and the Plaintiffs have failed to point to any evidence which detracts from this finding.  The court sustains Commerce's date of sale determination.

**Ordinary Course of Trade**

Antidumping duties should be "an amount equal to the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise."  19 U.S.C. § 1673.  Thus, Commerce must calculate both a CEP and a normal value.  The statute defines normal value as the price of the subject merchandise "at a time reasonably corresponding to the time of the sale used to determine the export

---

it could develop a practice in which shipment date would be the preferred date.  See Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,348-49 (Dep't Commerce May 19, 1997) (final rule) (rejecting shipment date as the uniform date of sale).
[7] In its Issues and Decision Memorandum Commerce said "[i]t is the Department's normal practice not to consider dates subsequent to the date of shipment from the factory to the customer as appropriate for the date of sale because once merchandise is shipped, the material terms of sale are established."  Issues and Decision Memorandum at 28.  At oral argument POSCO argued that while this practice appeared to contradict Commerce's regulation, "in the last 16 years they have modified their practice."  Oral Arg. at 12:21:30, Oct. 28, 2013, ECF No. 100.  Modifying a regulation in this manner would not be permissible.  If Commerce has determined through subsequent implementation of the regulation that a date other than the invoice date normally will better reflect the date of sale there are adequate procedures for changing the regulation.  See, e.g., Administrative Procedure Act, 5 U.S.C. § 553 (2006).

price or constructed export price," 19 U.S.C. § 1677b(a)(1)(A), where the price is "the

price at which the foreign like product is first sold . . . for consumption in the exporting

country, in the usual commercial quantities and in the ordinary course of trade . . . ."

19 U.S.C. § 1677b(a)(1)(B).   Thus, for Commerce to include a particular sale in its

calculation of a respondent's normal value, the sale must have been made in the ordinary

course of trade.   Congress defines ordinary course of trade as:

> the conditions and practices which, for a reasonable time prior to the
> exportation of the subject merchandise, have been normal in the trade
> under consideration with respect to merchandise of the same class or kind.
> The administering authority shall consider the following sales and
> transactions, among others, to be outside the ordinary course of trade:
>     (A) Sales disregarded under section 1677b(b)(1) of this title.
>     (B) Transactions disregarded under section 1677b(f)(2) of this title.

19 U.S.C. § 1677(15).[8]

Other than for the two statutory exclusions mentioned above, the Tariff Act

provides "little assistance in determining what is outside the scope of that definition." NSK

Ltd. v. United States, 25 CIT 583, 599, 170 F. Supp. 2d 1280, 1296 (2001).   The court

has held that Commerce has discretion to determine what sales are outside the ordinary

course of trade.   See, e.g., Bergerac, N.C. v. United States, 24 CIT 525, 536-37, 102 F.

Supp. 2d 497, 507 (2000); Torrington Co. v. United States, 25 CIT 395, 402-03, 146 F.

Supp. 2d 845, 861 (2001), aff'd, 62 Fed. Appx. 950 (Fed. Cir. 2003); U.S. Steel Group v.

United States, 25 CIT 1293, 1300, 177 F. Supp. 2d 1325, 1333 (2001).   Commerce's

---

[8] Although not relevant here, sales disregarded under § 1677b(b)(1) are sales made at
prices less than the cost of production, 19 U.S.C. § 1677b(b)(1), and transactions
disregarded under § 1677b(f)(2) are transactions between affiliated parties.   19 U.S.C.
§ 1677b(f)(2).

regulations in 19 C.F.R. § 351.102(b)(35)(2013) establish Commerce's methodology for

evaluating when sales are made outside the ordinary course of trade:

> [t]he Secretary may consider sales or transactions to be outside the ordinary
> course of trade if the Secretary determines, based on an evaluation of all of
> the circumstances particular to the sales in question, that such sales or
> transactions have characteristics that are extraordinary for the market in
> question. Examples of sales that the Secretary might consider as being
> outside the ordinary course of trade are sales or transactions involving off-
> quality merchandise or merchandise produced according to unusual
> product specifications, merchandise sold at aberrational prices or with
> abnormally high profits, merchandise sold pursuant to unusual terms of
> sale, or merchandise sold to an affiliated party at a non-arm's length price.

19 C.F.R. § 351.102(b)(35)(2013).  Therefore, Commerce may find that sales are outside

the ordinary course of trade if it determines that sales "have characteristics that are

extraordinary," based on a totality of the circumstances.  Id.  See also NSK Ltd., 25 CIT

at 599, 170 F. Supp. 2d at 1296 ("Commerce's methodology allows it, on a case-by-case

basis, to examine all conditions and practices which may be considered ordinary in the

trade under consideration and to determine which sales or transactions are, therefore,

outside the ordinary course of trade.").

          In applying its totality of the circumstances test, Commerce does not give

particular weight to any single factor.  Instead, Commerce determines which factor may

be more or less significant based on the case at hand.  See, e.g., Murata, 17 CIT at 263,

820 F. Supp. at 606.  In making its determination, Commerce looks "at market conditions,

practices, and other sales" in the home market, U.S. Steel Group, 25 CIT at 1300, 177 F.

Supp. 2d at 1333, and "it then compares the transactions in question to see if they exhibit

characteristics that are extraordinary for the market."  Id.  See also Mantex, Inc. v. United

States, 17 CIT 1385, 1403, 841 F. Supp. 1290, 1306 (1993).  Commerce has discretion

to determine when an unusual circumstance will render sales outside the ordinary course of trade.  See 19 C.F.R. § 351.102(b)(35)(2013); see also Koenig & Bauer-Albert AG v. United States, 22 CIT 574, 589, 15 F. Supp. 2d 834, 850 (1998) (finding that "Commerce has the discretion to decide under what circumstances highly profitable sales would be considered to be outside of the ordinary course of trade."), vacated on other grounds, 259 F.3d 1341 (Fed. Cir. 2001); NTN Bearing Corp. of Am. v. United States, 27 CIT 129, 169-71, 248 F. Supp. 2d 1256, 1289-91 (2003) (finding that Commerce's inclusion of respondent's sample sales and sales with high profits in the normal value calculation was properly within Commerce's discretion because the mere existence of an extraordinary factor does not negate the totality of the circumstances test for determining whether sales are representative of the home market).

In addition to the regulations, the court has commonly looked to the Statement of Administrative Action ("SAA") to discern Congress' intent regarding ordinary course of trade.  See, e.g., Monsanto Co. v. United States, 12 CIT 937, 940, 698 F.Supp. 275, 278 (1988) (stating that the "commonly understood purpose of the ordinary course of trade provision is to prevent dumping margins from being based on sales which are not representative, for example, sales of obsolete merchandise.").  The SAA states that

> Commerce may consider other types of sales or transactions to be outside the ordinary course of trade when such sales or transactions have characteristics that are not ordinary as compared to sales or transactions generally made in the same market. Examples of such sales or transactions include merchandise produced according to unusual product specifications, merchandise sold at aberrational prices, or merchandise sold pursuant to unusual terms of sale. As under existing law, amended section 771(15) does not establish an exhaustive list, but the Administration intends that Commerce will interpret section 771(15) in a manner which will avoid basing normal value on sales which are extraordinary for the market in question,

particularly when the use of such sales would lead to irrational or unrepresentative results.

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 834 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4171 ("SAA").  Thus, although Commerce's regulations reflect some of the language of the SAA, the SAA demonstrates a particular concern with extraordinary sales that would lead to "irrational or unrepresentative results."  Id.

Finally, without "adequate evidence of extraordinary characteristics," U.S. Steel Group, 25 CIT at 1300, 177 F. Supp. 2d at 1333, Commerce presumes the contested sales were made in the ordinary course and includes them in its margin calculations.  See, e.g., U.S. Steel Group, 25 CIT at 1300, 177 F. Supp. 2d at 1333; Bergerac, 24 CIT at 538, 102 F. Supp. 2d at 509; NTN Bearing Corp. of Am. v. United States, 19 CIT 1165, 1172, 903 F.Supp. 62, 68–69 (1995).  The court has characterized the burden imposed on the party challenging this presumption as requiring "a complete explanation of the facts which establish the extraordinary circumstances rendering particular sales outside the ordinary course of trade . . . ."  NTN Bearing Corp. of Am v. United States, 19 CIT 1221, 1229, 905 F.Supp. 1083, 1091 (1995).  See also Bergerac, 24 CIT at 538, 102 F. Supp. 2d at 509; Koyo Seiko Co. v. United States, 20 CIT 772, 783, 932 F.Supp. 1488, 1497-98 (1996).

The court sustains Commerce's determination that HYSCO's NTR sales were made within the ordinary course of trade as made in accordance with law and as supported by substantial evidence.  Commerce properly considered the totality of the circumstances, including the number and types of customers that purchased NTR

merchandise, the circumstances surrounding those sales, the average quantities purchased, the channels of distribution, and terms of sale.  Issues and Decision Memorandum at cmt 3.  It found that the number of customers was significant.  Id. (citing to HYSCO's Rebuttal Brief at 17, CD II EXT_051205 (Jan. 17, 2012), ECF No. 32 (May 7, 2012)).  It found "none of those customers were otherwise unique in their purchases," Issues and Decision Memorandum at cmt 3 (citing to HYSCO's Rebuttal Brief at 17), and found no evidence that the categories of customers for NTR sales were different from TR sales.  Issues and Decision Memorandum at cmt 3.   Neither did Commerce find anything unusual about the average purchase quantities.  Id.  It found no evidence that the terms of sale or channels of distribution were different for NTR sales than for TR sales.  Id.  U.S. Steel points to no evidence in the record that refutes any of these findings.  See Mem. Supp. Pl. U.S. Steel Mot. J. at 24-30.  Commerce's decision, based upon the totality of the circumstances, that HYSCO's NTR sales were not outside the ordinary course of trade is therefore reasonable and made in accordance with law.

Instead of directly challenging Commerce's factual findings on appeal, U.S. Steel contends that Commerce's inclusion of HYSCO's NTR sales in the normal value calculations was not in accordance with law.  Id. at 25.  U.S. Steel claims the SAA standard is controlling, and that it requires Commerce to exclude extraordinary sales when those sales produce irrational or unrepresentative results on the dumping margin.[9]

---

[9] U.S. Steel argues the SAA "establishes that Commerce must not base its margin calculations on sales that are 'extraordinary for the market in question' and cannot use non-ordinary sales that lead to 'irrational or unrepresentative results.'"  Mem. Supp. Pl. U.S. Steel Mot. J. at 26.  As such, plaintiff argues "Commerce does not have any discretion in the matter," because when there exists "a class of extraordinary sales that

See id. at 25-26.  See also SAA at 834.  U.S. Steel asserts that Commerce acted contrary to law by "ignor[ing] the straightforward directive of the SAA," Mem. Supp. Pl. U.S. Steel Mot. J. at 25, because HYSCO's home market NTR sales were "plainly extraordinary for the market in question."  Id. at 26.  In support of its argument that Commerce was required to exclude HYSCO's NTR sales, U.S. Steel makes two arguments.  First, U.S. Steel argues that [[                                   ]] between HYSCO's home market TR and NTR sales renders the NTR sales extraordinary.  Id. at 26.  Second, U.S. Steel argues that HYSCO's NTR "sales are extraordinary because they took place without leaving any paper (or email) trail."  Id. at 27.  Further, U.S. Steel asserts that HYSCO's NTR sales have an irrational effect on the dumping margin and, therefore, the SAA requires Commerce to exclude them.[10]  Id. at 28.

U.S. Steel's argument relies partly on the fact that [[      ]] of the time HYSCO's home market sales are TR.  However, neither Commerce's regulations nor the

---

by themselves produce an irrational result," the SAA requires those sales to be excluded from NV calculations.  Id. at 26.

[10] U.S. Steel contends
> if the [[    ]] of sales that were designated as non-temper rolled were classified as temper rolled, the dumping margin would have been over [[    ]].  And if the [[     ]] of non-temper rolled sales had been excluded from the margin calculation as outside the ordinary course of trade (i.e., so that HYSCO's dumping margin would be based on [[     ]] of its home market sales that were not unusual), HYSCO's dumping margin would have been [[      ]].

Mem. Supp. Pl. U.S. Steel Mot. J. at 28.  HYSCO questions U.S. Steel's conclusion regarding the impact these sales have on the margin.  See Mem. Def.-Interv. HYSCO Opp'n to Pl.'s Rule 56.2 Mot. J. at 28.  HYSCO argues that "U.S. Steel's claimed result is unsubstantiated in the record by a single computer program or calculation.  Correctly implementing the change that U.S. Steel suggests would require multiple changes throughout the Department's programs, given the complexity of the Department's calculations, and thus is highly prone to clerical error."  Id. at 29 n.5.

SAA requires sales to be excluded because they are comparatively [[      ]] in volume, but only if, for some reason, those sales are not representative of the market in question. See NTN Bearing Corp. of Am., 27 CIT at 171, 248 F. Supp. 2d at 1291 (upholding Commerce's determination that respondent's sample sales and high profit sales were in the ordinary course of trade because there was no evidence that "the transactions at issue possessed some unique and unusual characteristic that make them unrepresentative of the home market. . . "), appeal dismissed on motion to withdraw, 81 Fed. Appx. 318 (Fed. Cir. 2003).[11]  Indeed, the court has explicitly held that a [[                    ]] on its own, is not enough to warrant a finding that the contested sales were made outside the ordinary course of trade.  See Murata, 17 CIT at 263-64, 820 F.Supp. at 606-07.  See also Koyo Seiko Co., 20 CIT at 783, 932 F.Supp. at 1498.

Some potentially extraordinary sales characteristics that Commerce might consider in administering this test include sales where the merchandise is "off-quality," made with "unusual product specifications," or "sold pursuant to unusual terms of sale." 19 C.F.R. § 351.102(b)(2013).  See also SAA at 834.  All of these examples may involve

---

[11] In NTN Corp. v. United States, plaintiff and respondent, NTN, argued Commerce incorrectly treated its sample sales as made in the ordinary course of trade.  28 CIT 108, 136, 306 F. Supp. 2d 1319, 1344 (2004) aff'd, 125 Fed. Appx. 1011 (Fed. Cir. 2005). NTN claimed "Commerce acknowledged that these sales were relatively few in number, but then found that NTN's sample sales were not rare or uncommon."  NTN Corp., 28 CIT at 136, 306 F. Supp. 2d at 1344.  In rebutting Commerce's rationale, NTN argued the same thing as plaintiff herein.  Specifically, NTN argued that a determination of whether a particular sales' factor is unusual should be based on a comparison of the contested sales with overall sales.  See NTN Corp., 28 CIT at 136, 306 F. Supp. 2d at 1344.  The court found that "Commerce reasonably exercised its discretion in requiring NTN to provide evidence that its sample . . . sales were outside the ordinary course of trade." NTN Corp., 28 CIT at 139, 306 F. Supp. 2d at 1347.

a relatively [[    ]] comparative volume of sales in the home market, but merely declaring

that there is a [[    ]] volume is not sufficient to show that the sales were extraordinary.

Commerce must consider the totality of circumstances in each case to determine whether

the sales or transactions at issue would not be representative of the market.  See U.S.

Steel Group, 25 CIT at 1299, 177 F. Supp. 2d at 1332.

U.S. Steel argues that the NTR sales do have unusual physical and

production characteristics because they represent [[    ]] of HYSCO's subject home

market sales and therefore they are, by definition, different from [[    ]] of HYSCO's

subject home market sales both in terms of their physical characteristics and how they

are produced.  Mem. Supp. Pl. U.S. Steel Mot. J. at 26.  This argument, if accepted, would

inappropriately convert an inquiry concerning physical characteristics or production

process into a question of numbers.   U.S. Steel makes no argument that the sales

themselves have unusual attributes, such as sales of off-quality merchandise, or of

merchandise made pursuant to unusual specifications.  See id. at 26-29.

Second, U.S. Steel points to the lack of paper documentation for HYSCO's

NTR sales to argue that they are "inherently unverifiable" and, as such, extraordinary.  Id.

at 27-28.  This contention fairs no better.  Commerce found that the way in which the NTR

sales were made was not unusual.  Issues and Decision Memorandum at cmt 3.  In the

Issues and Decision Memorandum, Commerce found that  "the number of customers that

purchase non-temper rolled merchandise is significant, and that none of those customers

were otherwise unique in their purchases of home market sales of subject merchandise

from HYSCO."  Issues and Decision Memorandum at cmt 3.  U.S. Steel says nothing

about whether the lack of a paper trail is unusual either for HYSCO or sales of NTR merchandise in the home market generally.  Mem. Supp. Pl. U.S. Steel Mot. J. at 27-28.

U.S. Steel then argues that, per the SAA standard, these sales should be excluded because of their unrepresentative impact on the dumping margin.  Id. at 28.  U.S. Steel contends that it would be irrational to allow [[      ]] of sales "to control the outcome of a case . . . ."  Id. at 28.  U.S. Steel relies upon the language of the SAA which provides that Commerce is to "avoid basing normal value on sales which are extraordinary . . . particularly when the use of such sales would lead to irrational or unrepresentative results."  SAA at 834.  For Commerce to consider the impact of the sales on the dumping margin, the language of the SAA first requires that the sales exhibit extraordinary characteristics.  However, if based on the totality of the circumstances, Commerce, as it did here, appropriately finds that the contested sales were not extraordinary then the impact of those sales on the margin is irrelevant.

Based on the foregoing, Commerce's decision to reject U.S. Steel's argument that HYSCO's NTR home market sales were outside the ordinary course of trade was made in accordance with law and supported by substantial evidence.

**Revocation**

Congress provided for the revocation of an antidumping order in 19 U.S.C. § 1675(d).  The statute provides in relevant part:

> (d) Revocation of order or finding; termination of suspended investigation
> (1) In general
> The administering authority may revoke, in whole or in part, a countervailing duty order or an antidumping duty order or finding, or terminate a suspended investigation, after review under subsection (a) or (b) of this section. . . .

19 U.S.C. § 1675(d).  Commerce's regulations set forth the requirements for a request

for revocation.

> (e) Request for revocation or termination—
>> (1) Antidumping proceeding.  During the third and subsequent annual anniversary months of the publication of an antidumping order or suspension of an antidumping investigation, an exporter or producer may request in writing that the Secretary revoke an order or terminate a suspended investigation under paragraph (b) of this section with regard to that person if the person submits with the request:
>> (i) The person's certification that the person sold the subject merchandise at not less than normal value during the period of review described in §351.213(e)(i), and that in the future the person will not sell the merchandise at less than normal value;
>> (ii) The person's certification that, during each of the consecutive years referred to in paragraph (b) of this section, the person sold the subject merchandise to the United States in commercial quantities; and
>> (iii) If applicable, the agreement regarding reinstatement in the order or suspended investigation described in paragraph (b)(2)(iii) of this section.

19 C.F.R. § 351.222(e)(1)(2013).  Commerce's regulations discuss Commerce's

determination when to revoke in part:

> (2)(i) In determining whether to revoke, an antidumping duty order in part, the Secretary will consider:
>> (A) Whether one or more exporters or producers covered by the order have sold the merchandise at not less than normal value for a period of at least three consecutive years;
>> (B) Whether, for any exporter or producer that the Secretary previously has determined to have sold the subject merchandise at less than normal value, the exporter or producer agrees in writing to its immediate reinstatement in the order, as long as any exporter or producer is subject to the order, if the Secretary concludes that the exporter or producer, subsequent to the revocation, sold the subject merchandise at less than normal value; and
>> (C) Whether the continued application of the antidumping order is otherwise necessary to offset dumping.

> (ii) If the Secretary determines, based upon the criteria in paragraphs (b)(2)(i)(A) through (C) of this section, that the antidumping duty order as to those producers or exporters is no longer warranted, the Secretary will revoke the order as to those producers or exporters.

19 C.F.R. § 351.222(b)(2)(i)-(ii) (language effective until June 20, 2012).

The statute "provides minimal guidance" to Commerce and is "silent as to the conditions that might warrant the revocation of an antidumping duty order or the particular circumstances that would trigger such an action." Sahaviriya Steel Indus. Pub. Co. v. United States, 649 F.3d 1371, 1376 (Fed. Cir. 2011). Thus, Commerce has discretion in making a revocation determination including whether the requesting party satisfied the criteria for revocation. See, e.g., Feili Group (Fujian) Co., v. United States, 34 CIT __, __, 724 F. Supp. 2d 1358, 1369 (2010).

Commerce's determination is supported by substantial evidence and in accordance with law. Commerce explained that it was satisfied POSCO fulfilled the 19 C.F.R. § 351.222(e) certification requirements. Issues and Decision Memo at cmt 5, n.78 (citing POSCO Letter to the Dept., PD I 4 (Aug. 31, 2010), ECF No. 32 (May 7, 2010)). Next, Commerce applied the criteria in 19 C.F.R. § 351.222(b)(2)(i) (language effective until June 20, 2012). It was undisputed that POSCO had de minimis margins for three consecutive years. Commerce found that POSCO had sold "at not less than normal value" for those years. 19 C.F.R. § 351.222(b)(2)(i)(A) (language effective until June 20, 2012); Issues and Decision Memorandum at cmt 5, nn.79-80. Commerce presumes continued application of the order is unnecessary after three consecutive findings of an absence of dumping unless the petitioner comes forward with information to rebut. Id. at n.82 (citing Amended Regulation Concerning the Revocation of Antidumping and Countervailing Duty

Orders, 64 FR 51236 (Sept. 22, 1999)).   Commerce's application of its standard is reasonable.

Plaintiffs' arguments that revocation was unsupported by substantial evidence or otherwise not in accordance with law are unavailing.   First, as discussed above, Plaintiffs' claim that the revocation was based in part on Commerce's erroneous date of sale determination lacks merit.

Second, Plaintiffs argue that Commerce failed to address record evidence of specific market and economic factors which showed a likelihood of future dumping and thus that the continued application of the dumping order was necessary.   Without nuance, U.S. Steel argues that POSCO's increasing production capacity and other business practices along with lost market share by domestic producers show a likelihood of future dumping.   Mem. Supp. Pl. U.S. Steel Mot. J. at 23-24.   In greater detail, Nucor argues that future dumping is likely because: (i) the economic downturn made the last three reviews unrepresentative, (ii) POSCO's shipment volumes and market share in Korea have declined while its production has increased, and (iii) it has established a "strategic partnership" with Union Steel Manufacturing Co. Ltd. (another respondent).   Br. Supp. Nucor 56.2 Mot. at 12-16.   However, assertions of market conditions are not evidence that the order is "otherwise necessary to offset dumping."   19 C.F.R. § 351.222(b)(2)(i) (language effective until June 20, 2012).   Plaintiffs would have Commerce speculate that these facts support the conclusion that POSCO is likely to sell at less than normal value in the future.   While Commerce must "address significant arguments and evidence which seriously undermine its reasoning and conclusion" it does not need to address every

assertion made by the petitioners.  Altx, Inc. v. United States, 25 CIT 1100, 1117-1118, 167 F.Supp.2d 1353, 1374 (2001), aff'd, 370 F.3d 1108 (Fed. Cir. 2004); see also 19 U.S.C. § 1677f(i)(3)(A).  Here, where the assertions do no more than ask Commerce to speculate, it is reasonable to conclude that Commerce considered the assertions and did not credit them.

Finally, Nucor argues that Commerce was unable to complete verification with regard to POSCO and thus, its determination was unsupported by substantial evidence and otherwise not in accordance with law.  Commerce has discretion in how it conducts its verification process.  See Floral Trade Council v. United States, 17 CIT 392, 398-99, 822 F. Supp. 766, 771-72 (1993).  In its Issues and Decision Memorandum, Commerce correctly notes that it is "afforded [] a degree of latitude in implementing its verification procedures, and that the Department is not required to verify each item submitted in respondents' questionnaire."  Id. at cmt 5, n.88; see also Floral Trade Council, 17 CIT at 399, 822 F. Supp. 2d at 772 (internal citations omitted).  Contrary to Nucor's assertion that Commerce must conduct a "completeness test," Br. Supp. Nucor 56.2 Mot. at 11-12, "verification is an audit process that selectively tests accuracy and completeness of a respondent's submissions."  Issues and Decision Memorandum at cmt 5, n.89 (citing Bomont Indus. v. United States, 14 CIT 208, 209, 733 F.Supp 1507, 1508 (1990)); see also Floral Trade Council, 17 CIT at 398, 822 F. Supp. at 771.  Although verification was not completed, it did not need to be complete for this court to sustain Commerce's finding.  See Floral Trade Council, 17 CIT at 399-400, 822 F. Supp. at 772; Hercules, Inc. v. United States, 11 CIT 710, 726, 673 F.Supp. 454, 469-70 (1987)).

Therefore, Commerce's decision to revoke the order with respect to POSCO is supported by substantial evidence and in accordance with law.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for judgment on the agency record is denied.  Judgment will be entered accordingly.


        /s/ Claire R. Kelly
        Claire R. Kelly, Judge

Dated: December 27, 2013
        New York, New York